Filed 1/27/15  P. v. Barba CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GERARDO BARBA,<br><br>    Defendant and Appellant. | D064105<br><br><br>(Super. Ct. No. SCD240327) |


APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Gerardo Barba of two counts of committing a lewd act upon a child. (Pen. Code,[1] § 288, subd. (a).) As to each count, it found true that the child was under the age of 14 (§ 1203.066, subd. (a)(8)) and Barba committed the offense against more than one victim under the "One Strike" law (§ 667.61, subds. (b), (c) & (e)). The jury found him not guilty on one count of committing a lewd act and deadlocked on four other such counts. The court sentenced Barba to two consecutive terms of 15 years to life for a total term of 30 years to life in prison, and ordered him to pay certain fees and fines.

Barba contends the court prejudicially erred by: (1) denying his request for a continuance; (2) allowing an expert about forensic interviews with children to testify regarding child sexual abuse accommodation syndrome (CSAAS), and that children lack the memory tools of adults; (3) sentencing him to two consecutive terms; and (4) imposing a sentence of 30 years to life, which was assertedly cruel and unusual punishment. We affirm.

## FACTUAL BACKGROUND

*A.B.'s case*

A.B. testified that in November 2010, when she was approximately nine years old, her parents had planned to go out for dinner and send her to spend the night at the home of her grandparents, Barba and his wife. A.B. became upset and begged her parents not to send her there. She told her parents for the first time that, starting when she was in the third grade, Barba had touched her breasts and vagina at different times at his home.

---

[1]     Statutory references are to the Penal Code unless otherwise stated.

2

A.B. testified that in the different incidents, Barba had touched her both over and under her underwear. A.B. had not told anybody about the incidents earlier because she was scared that her family would "split up."[2]

A.B.'s father immediately confronted his father, Barba, about A.B.'s claims, and Barba lowered his head, avoided looking at his son, repeatedly shook his head and denied the claims. Afterwards, A.B.'s parents cut off further contact with Barba's side of the family.

A.B.'s parents contacted the police, who investigated the matter. In December 2010, A.B. disclosed the above incidents to Lisa McCulloch, a forensic interviewer at a children's hospital.

*A.D.'s case*

In January 2012, when A.D. was approximately five years old, she and her mother attended a party at the home of Barba and his wife, who were A.D.'s uncle and aunt. A.D. and her cousin were playing a video game in the living room when Barba told A.D. to sit on his lap. Barba put A.D.'s hand on his penis outside of his clothing, but she removed her hand. Barba again placed her hand on his penis outside of his clothing and moved her hand in circles. A.D. told her mother about the incident, and her mother reported it to law enforcement. In late January 2012, Marisol Olguin, a forensic interviewer, spoke to A.D., who recounted the incident. During the interview, A.D. did

---

[2]    The information alleged the incidents had taken place between May 27, 2007 and November 11, 2010.

not initially disclose Barba's actions. However, after much questioning, A.D. eventually described what Barba had done.

DISCUSSION

I.

Barba contends the court violated his fundamental constitutional rights to present a defense and to have a fair trial by denying his March 7, 2013 request for a continuance of his trial.

*Background*

After Barba lost consciousness in February 2013, defense counsel sought to delay trial until a medical examination could be completed, which would determine whether Barba was suffering from dementia. Barba's counsel's attached a declaration to his continuance motion stating: "Mr. Barba is almost 73 years old. He has been observed by family members talking to persons who are not there, forgetting simple tasks, losing consciousness, and staring into space. There are preliminary indications that Mr. Barba may be suffering from dementia. An examination by a neurologist has been scheduled by Dr. Rickwa to determine whether in fact Mr. Barba has been suffering from this disease which affects cognitive functioning. However, the neurologist's examination is scheduled to take place after the week of March 11, 2013 which is currently set for trial."

At a March 11, 2013 hearing on the matter, the prosecutor opposed the motion: "[W]hy is this brought up at the eleventh hour? This case has been in existence, we've worked hard to get a good jury trial date, and all [of a] sudden this is coming up at the

4

eleventh hour. The People are ready. We want to go forward today. It is a serious case, yes. The victims have been waiting a long time to go forward with this case."

At a first hearing on the matter, a calendar judge ascertained that defense counsel had represented Barba for approximately one year at that point, but had not previously consulted experts regarding Barba's possible mental health decline; that the first charged incident had occurred approximately six years ago, and that the last charged incident had occurred approximately one year ago. The judge denied Barba's motion as untimely, recommending that Barba revisit the issue with the trial judge.

On March 14, 2013, the trial judge denied Barba's continuance motion: "Of course I do understand the defense can argue what seems to be a consistent position, 'It didn't happen, period. But if I did, I didn't have the required intent.' But that's a difficult position to present to the jury, I think. [¶] So I just don't think that there's any likelihood that we're depriving [Barba] of the right to present what I would think is a viable defense . . . . [¶] But, . . . if things change in the next few days, before jeopardy has attached, then we can reevaluate it."

At a March 18, 2013 hearing, just before jury selection commenced, defense counsel renewed the continuance request, explaining that on February 3, 2013, Barba had lost consciousness and was therefore tested at the hospital. One week before trial, counsel learned that Barba's primary care doctor had mentioned that Barba possibly was suffering from dementia. Therefore, defense counsel sought a neuropsychological evaluation scheduled for April 24, 2013, to determine Barba's mental condition. Following that evaluation, defense counsel would have to consult a medical expert to

5

assess Barba's mental functioning.  Based on that consultation, Barba's possible defense at trial would be that if he had touched the victims inappropriately, he had lacked the required specific intent to commit the charged crimes.  The court again ruled he had shown no good cause for a continuance.[3]

*Applicable Law*

A continuance in a criminal case may be granted only for good cause.  (§ 1050, subd. (e).)  Whether good cause exists is a question for the trial court's discretion.  (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.)  The court must consider " ' "not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion." ' "

---

[3]     Barba renewed his arguments at a new trial motion.  At a June 2013 hearing on the motion, the court rejected that argument, noting that up until that date, Barba still had not presented any evidence showing he suffered from dementia:  "There's a distinction between a present—some present aspect of dementia which might affect [Barba's memory]; that would not provide a defense.  That might provide some challenges at trial if he has a lack of memory, but that wouldn't . . . present any defense, particularly since these incidents occurred in the past.  And . . . I haven't seen any evidence of any substance at all that at the time of these alleged offenses [Barba] might have been suffering from some sort of dementia which would rise to the level of providing a defense to these charges, which do require specific intent.  . . .  And assuming that the [medical] appointment that had been made was kept or a similar appointment occurred, I haven't seen any evidence of any medical opinion, other than . . . I think the primary care physician said, 'Well, maybe we ought to also get some [psychological evaluation] as to whether there's some dementia here.' "  The court concluded:  "Even if there is some diagnosis of dementia now, I think it's highly unlikely that . . . any professional would be able to say, 'Well, I can say that four, five, six years ago [Barba's] dementia was such that it would prevent him from forming the required specific intent.  Not the capacity, but in actuality there was a diminished capacity.'  I don't think there's a shred of evidence to support that."

6

(*Ibid.*)  While a showing of good cause requires that both counsel and the defendant demonstrate they have prepared for trial with due diligence (*ibid.*), the trial court may not exercise its discretion "so as to deprive the defendant or his attorney of a reasonable opportunity to prepare."  (*People v. Sakarias* (2000) 22 Cal.4th 596, 646.)

A reviewing court considers the circumstances of each case and the reasons presented for the request to determine whether a trial court's denial of a continuance was so arbitrary as to deny due process.  (*People v. Frye* (1998) 18 Cal.4th 1013.)  A defendant has the burden of showing by "affirmative proof . . . that the ends of justice require a continuance."  (Cal. Rules of Court, rule 4.113.)  Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal.  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1126.)

Here, there was no abuse of discretion.  Barba made his continuance request on the eve of trial.  Although Barba's counsel did not specify the length of the desired continuance, it is reasonable to assume it would have significantly delayed trial because one neuropsychological examination was scheduled more than a month beyond the previously set trial date, with no indication of whether follow-up medical examinations would be necessary.

Here, counsel failed to establish on the record that a continuance would have been useful.  A speculative need does not establish good cause for a continuance.  (*People v. Beeler* (1995) 9 Cal.4th 953, 1004.)  As the trial court stated, assuming defense counsel had obtained evidence that Barba suffered from dementia, Barba's defense based on that diagnosis would have had to address the speculative matter of whether, or to what extent,

7

a later dementia diagnosis demonstrated Barba had lacked specific intent to commit the actions against the victims, starting as early as six years previously. The record does not show Barba manifested symptoms of dementia before February 2013. Moreover, Barba previously had denied engaging in the alleged criminal conduct. In light of the speculative nature of Barba's proposed defense, he has not supported his claim that he suffered prejudice because his continuance motion was denied. "[I]t is not every denial of a request for more time that violates due process." (*Ungar v. Sarafite* (1964) 376 U.S. 575, 589.)

## II.

## A.

Barba contends the People's expert, Catherine McLennan, was unqualified to testify about CSAAS because she lacked special knowledge, expertise and formal education on the subject; therefore, the trial court erred in admitting her testimony. He adds: "Her testimony also was irrelevant, intruding on the jury's function. There was no evidence the jury held common myths or misperceptions on the subject. Thus, there was nothing to dispel. Also, the testimony was not justified on the issue of credibility since credibility is generally always at issue in any given case." Barba further argues McLennan's testimony "conveyed the opinion that the jury should accept [the victims'] versions of what happened because their behavior was like those of other victims of child sexual abuse and thus they must be telling the truth. On this point, the prosecution elicited McLennan's testimony not to rehabilitate the victims based on the defense, but to prove [Barba] committed the lewd acts. The defense was not aimed at showing that the

8

victims did not act like other child molestation victims. [Defense] counsel sought to argue that motives existed for fabrication and the prosecution did not provide enough evidence to prove [Barba's] guilt beyond a reasonable doubt."

*Background*

During in limine proceedings, Barba sought an Evidence Code section 402 hearing regarding McLennan's qualifications. The court pointed out that McLennan's curriculum vitae showed she had obtained a master's degree in social work. The prosecutor elaborated regarding McLennan's qualifications: Since 1985 she has worked at Palomar Hospital. In her current position, she supervises another forensic interviewer and spends approximately half of her time interviewing children. McLennan had conducted over 2,000 interviews. During the previous 15 years she had taught courses related to forensic interviewing. McLennan had testified as an expert in approximately 45 cases in California.

The court ruled McLennan's testimony regarding CSAAS was relevant under Evidence Code sections 210 and 352, and admissible under *People v. Bowker* (1988) 203 Cal.App.3d 385 (*Bowker*).

On direct examination, the prosecutor asked McLennan to state some common myths and misconceptions about child sexual abuse, starting with disclosure patterns. McLennan replied that a common misunderstanding relates to "the way in which children disclose or don't disclose about child sexual abuse," noting that certain studies in the area establish that it is extremely difficult for children to disclose child sexual abuse, and if they do, the disclosure is generally delayed. The prosecutor asked McLennan to discuss a

9

"misconception that if young victims don't appear frightened around their abuser, scared of their abuser, and they continue to socialize with their abusers around the house or in a social setting, despite being touched, then the described molests did not occur." McLennan responded: "It's really unusual for a child to make a decision to discontinue a relationship with an adult, particularly if that adult is a caretaker or is instrumental in that child's day-to-day life. Kids just don't decide they're not going to be around somebody anymore, and I would say it's likely that—I think there's a bit of a misconception that in order to access a child like that and keep them in a relationship, that someone would have to threaten them or they'd have to be afraid, when in fact very commonly kids enter that relationship or engage in it initially or allow that to happen because there's been a really positive aspect to it."

McLennan testified she did not know the details of the prosecution's case against Barba, not having received discovery or interviewed the witnesses in this case. She also stated that her testimony regarding the "myths and misconceptions around child abuse" is essentially the same in every case.

The court instructed the jury with an adapted version of CALCRIM No. 332: "A witness was allowed to testify as an expert and to give an opinion. You must consider the opinion, but you are not required to accept it as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert

10

relied in reaching that opinion.  You must decide whether information on which the expert relied was true and accurate.  You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.  [¶]  An expert witness may be asked a hypothetical question.  A *hypothetical question* asks the witness to assume certain facts are true and to give an opinion based on the assumed facts.  It is up to you to decide whether an assumed fact has been proved.  If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion.  [¶]  Testimony of Catherine McLennan was offered and may be considered by you only for the purpose of understanding and explaining the behavior of the alleged victim in this case and not as proof that the molestations occurred."

During closing arguments, defense counsel stated that both victims were subjected to "suggestive questioning" during their forensic interviews:  "I believe the [child protective services] workers and the forensic interviewers call it funneling, but you've got to admit that the testimony in this case was tainted, to use a phrase used by Detective Williams."

*Applicable Law*

In *Bowker, supra,* 203 Cal.App.3d at p. 391, this court considered whether the People may introduce expert testimony regarding CSAAS in cases in which a defendant is accused of sexually abusing a child.  We concluded that testimony pertaining to CSAAS is admissible for "the limited purpose of disabusing the jury of misconceptions as to how child victims react to abuse."  (*Bowker,* at p. 392.)  For example, such testimony may be admissible to "explain [a victim's] delay in reporting the abuse and her

11

last-minute recantation of the charges."  (*People v. Housley* (1992) 6 Cal.App.4th 947, 955.)  However, '[i]t is beyond dispute that CSAAS testimony is inadmissible to prove that a molestation actually occurred.' "  (*People v. Wells* (2004) 118 Cal.App.4th 179, 188.)

*Analysis*

The court did not abuse its discretion by denying Barba's motion in limine regarding CSAAS evidence.  As noted, CSAAS evidence addresses the common reactions of child molestation victims, such as delayed reporting and retraction.  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*); see *Bowker, supra,* 203 Cal.App.3d at pp. 389, 392-394.)

Here, as in *Bowker, supra,* 203 Cal.App.3d 385, McLennan's testimony showed that the victims' response to child abuse was helpful to explain to the jury behavior that would otherwise undermine their credibility.  Specifically, A.B. delayed a long time before telling her parents about Barba's touching, which started when she was approximately nine years old.  In A.D.'s case, she was slow to discuss Barba's inappropriate touching during her forensic interview.  Thus, McLennan's testimony was relevant as it had "some 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)" (*People v. Contreras* (2013) 58 Cal.4th 123, 152.)  Relevant evidence includes evidence related to a witness's credibility.  (*Ibid.*)

Based on our review of the record, the probative value of CSAAS evidence was not substantially outweighed by the danger of misinterpretation identified by Barba.  (See

12

Evid. Code, § 352; *People v. Stark* (1989) 213 Cal.App.3d 107, 114-115.) Moreover, the court properly instructed the jury that CSAAS evidence was not direct evidence of guilt, thus minimizing any risk of misinterpretation by the jury. We therefore find no abuse of discretion in the court's decision to admit CSAAS evidence.

It is clear from McLennan's curriculum vitae that she had sufficient educational and professional expertise to provide expert testimony concerning the behavior of child sexual abuse victims and specifically human memory. (Evid. Code, § 720, subd. (a) ["A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates."].)

### B.

Barba contends McLennan's testimony minimized Barba's defense that there was insufficient evidence to support the allegations against him. Barba specifically argues that McLennan's testimony "suggest[ed] that children's credibility must be judged by a different standard as they are not capable of speculation and their capacity for memory is significantly less than that of an adult. The inference for the jury was that any lack of specificity or doubt from the victims' testimony should be excused."

On appeal, Barba challenges a particular statement McLennan made during direct examination in response to this question by the prosecutor: "From your training and experience, say a child has numerous incidents of molest occur to them over a given amount of time . . . [is it] difficult for a child to recall each time and all the surrounding details of the molest?" McLennan replied: "If it's something that's happened in a very

13

similar way over a long period of time, usually what happens is you'll hear the child begin to lapse into saying things like, 'Well, it was always this way,' or 'He would do this,' and it's really hard to get that like individual thing out because it all boils down to kind of what we as adults refer to as the gist of it. If you do something all the same time and I ask you about it, you'll start picking through your memory about, 'Let me think a minute. Usually Friday nights we're together.' And so I would say, you know, 'Friday nights, maybe. That would be the more likely time it would happen.' Kids don't do that. Kids don't speculate. They don't have that ability. They also don't have the memory tools that an adult has."

Defense counsel objected to that response as lacking foundation, arguing McLennan did not have expertise regarding human memory. The court overruled the objection, stating that defense counsel could address that matter on cross-examination. Defense counsel cross-examined McLennan: "With regards to training on the human memory, what does that entail? What kind of formal training have you had in that area?" She replied, "[A]s it applies to interviewing, a portion of our training for forensic interviewing is devoted in part to the way in which we as people develop memory because it's important. The interviewer's job in part is to try to cue the child's memory about what it is we want to hear about without contaminating or spoiling it, and so to the degree that I need to understand how memory develops in order to accomplish my forensic interviewing task, we do talk about memory development in forensic interviewing classes, and I think you'll find that as part of every forensic interviewing training of any length."

Here, counsel took the opportunity to cross-examine McLennan regarding her studies on human memory. He did not thereafter renew his argument her testimony lacked foundation. She did not testify that the victims' accounts were accurate or that Barba had committed the crimes. We conclude that the trial court did not abuse its discretion in admitting McLennan's expert testimony. In any event, we conclude that it is not reasonably probable that Barba would have received a more favorable outcome absent McLennan's testimony regarding children's memory. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) We note that the jury acquitted Barba and deadlocked on other charges. This indicates the jury was conscientious and decided the case based only on those portions of the victims' evidence that it believed supported each specific allegation.

### III.

Barba challenges his sentence on two grounds. He first contends the court abused its discretion by imposing consecutive terms on him because it used a circumstance that had already resulted in his enhanced sentence, namely the multiple victims allegations of section 667.61, to justify consecutive sentences. He further argues the court "failed to properly weigh applicable mitigating circumstances, e.g., [his] advanced age, 73 years old, the lack of force or violence during commission of the offenses, the lack of criminal history."

*Background*

In their sentencing brief, the People argued Barba should be sentenced to two consecutive terms of 15 years to life each, pointing to circumstances in aggravation that the victims were particularly vulnerable based on their ages and family relationship with

15

Barba; he carried out the crimes in a manner suggesting planning, sophistication or professionalism; and he took advantage of his position of trust or confidence to commit the offenses. The People stated that under California Rules of Court, rule 4.425, the crimes and their objectives were predominantly independent of each other and Barba committed them at different times or separate places. The crimes were not committed so closely in time and place as to indicate a single period of aberrant behavior.

The probation officer recommended consecutive sentences for Barba, listing as a circumstance in mitigation that he had had no prior criminal history, and considering as circumstances in aggravation that the victims were particularly vulnerable given their young ages and inability to defend themselves; Barba took advantage of his position of trust and confidence over them; and he did not appear remorseful during a probation interview.

In sentencing Barba, the court stated it had read the probation officer's report and the letters written by Barba's family members. It rejected Barba's constitutional argument regarding the multiple victims component of section 667.61, took into account that there were two separate victims, and noted that Barba had committed lewd acts on the second victim after sufficient time had passed for Barba to have reconsidered his actions, but he failed to do so. The court also noted that Barba was advanced in years: "I don't mean to seem uncaring about it, but at his—you know, at his age, one wonders whether, as a practical matter, it's not—how much difference it's likely to make. But that's—I'm not making my decision based on that ground."

16

A.

Barba was convicted of two counts of lewd conduct (§ 288, subd. (a)), an offense potentially subject to a 15-year-to-life term under the One Strike law, which "sets forth an alternative and harsher sentencing scheme for certain enumerated sex crimes." (*People v. Mancebo* (2000) 27 Cal.4th 735, 741.) The sex crimes subject to the One Strike law are set forth in section 667.61, subdivision (c), and include lewd and lascivious conduct (§ 288, subd. (a)). Subdivision (b) of the statute states that a 15-year-to-life sentence "shall" be imposed for the crimes so enumerated, provided that two or more circumstances described in subdivision (e) of section 667.61 are established. (§ 667.61, subds. (a) & (c)(4).)

Rule 4.425(a) of the California Rules of Court sets forth crime-related criteria affecting the imposition of consecutive rather than concurrent sentences: "(1) The crimes and their objectives were predominantly independent of each other; [¶] (2) The crimes involved separate acts of violence or threats of violence; or [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior."

Trial courts have broad discretion to decide whether concurrent or consecutive sentences are appropriate. (*People v. Clancey* (2013) 56 Cal.4th 562, 579; *People v. Leon* (2010) 181 Cal.App.4th 452, 468.) "In the absence of a clear showing of abuse, the trial court's discretion in this respect is not to be disturbed on appeal. [Citation.] Discretion is abused when the court exceeds the bounds of reason, all of the circumstances being considered." (*People v. Bradford* (1976) 17 Cal.3d 8, 20.)

17

Here, we conclude the trial court did not abuse its discretion in sentencing Barba to two consecutive terms, in light of the fact there were two victims, and Barba committed the criminal acts against them approximately one year apart.  During the intervening period, Barba had had sufficient time to reconsider his actions.  He nevertheless continued his behavior, justifying consecutive terms under the rules of court criteria.

B.

Barba next contends his sentence is unconstitutional as applied in his case because it is cruel and unusual.  He emphasizes that the length of the sentence is grossly disproportionate to the nature of the offenses he committed, especially taking into account his age, the fact that he has no prior criminal record, he was known to have good character, and the offenses did not involve force or violence.

The Eighth Amendment's ban on cruel and unusual punishment prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime. (*Ewing v. California* (2003) 538 U.S. 11, 20-21.)  In *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the Supreme Court recognized that punishments prohibited as unconstitutionally disproportionate to the offense generally fall into two classifications: Those that are categorically prohibited, and those that are prohibited based on the facts of a particular case.  (*Ewing,* at pp. 58-59.)

To determine whether a particular sentence is so grossly disproportionate that it violates the federal Constitution, the court considers all the circumstances of the case, including the gravity of the offense and the severity of the penalty as well as whether

18

more serious crimes are subject to the same penalty in other jurisdictions. (*Graham, supra,* 560 U.S. at p. 58; *Solem v. Helm* (1983) 463 U.S. 277.) No single criterion is dispositive. (*Solem,* at p. 291, fn. 17.) " '[O]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [will be] exceedingly rare.' " (*Id.* at p. 290, quoting *Rummel v. Estelle* (1980) 445 U.S. 263, 271.) Still, although deference is given to the Legislature's prescribed sentence for a particular crime (*Solem,* at p. 290), no penalty is per se constitutional. (*Ibid.*)

Similarly, under state law Barba must overcome a "considerable burden" in challenging his penalty as cruel or unusual. (*People v. Wingo* (1975) 14 Cal.3d 169, 174.) He must demonstrate the punishment is so disproportionate to the crime for which it was imposed it "shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424; accord, *People v. Dillon* (1983) 34 Cal.3d 441, 478.) The *Lynch* court identified three factors for the reviewing court to consider in assessing this constitutional claim: (1) the nature of the offense and the offender; (2) how the punishment compares with punishments for more serious crimes in the jurisdiction; and (3) how the punishment compares with the punishment for the same offense in other jurisdictions. (*Lynch*, at pp. 425-427.)

To evaluate whether a particular punishment is cruel or unusual, courts examine the nature of the offense and of the offender, " 'with particular regard to the degree of danger both present to society.' " (*People v. Dillon, supra,* 34 Cal.3d at p. 479.) In assessing the nature of the offense, a court should consider the circumstance of the particular offense such as the defendant's motive, the way the crime was committed, the

extent of his involvement and the consequences of his acts. (*Ibid*.) In analyzing the nature of the offender, a court should consider his "age, prior criminality, personal characteristics, and state of mind." (*Ibid.*) "[A] punishment which is not disproportionate in the abstract is nevertheless constitutionally impermissible if it is disproportionate to the defendant's individual culpability." (*Id.* at p. 480.)

In resolving Barba's contention, we rely in part on the analysis of another court in this district: "So, in answer to the challenge of defendant in the matter before us, we start by comparing the gravity of his offense and the severity of the sentence imposed. Viewed along a spectrum, we may find murder, mayhem and torture among the most grave of offenses and petty theft among the least. Considered in this context, lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable. It may have lifelong consequences to the well-being of the child." (*People v. Christensen* (2014) 229 Cal.App.4th 781, 803.)

Furthermore, Barba was sentenced for two offenses against two different victims. Any one act in isolation was a serious offense. Cumulatively, without a doubt, his offenses were grave. As stated in *Graham, supra,* 560 U.S. 48, " 'punishment for crime should be graduated and proportioned to [the] offense.' " (*Id*. at p. 59.) Moreover, as observed in *Ewing v. California, supra,* 538 U.S. 11, in determining proportionality, the state's choice to deal with repeat offenders in a harsher manner is a penological goal that must be taken into account. (*Id.* at p. 29.) Taking these factors into consideration, we conclude that Barba's penalty is not harsh in relation to the gravity of the offenses. "The gross disproportionality principle reserves a constitutional violation for only the

20

extraordinary case." (*Lockyer v. Andrade* (2003) 538 U.S. 63, 77.) This underlying case is not one.

Barba molested two young family members whose parents had entrusted them to his care and supervision. In so doing, he breached the trust placed in him. He emphasizes that he had no prior criminal record before being convicted for the present offenses. But the lack of a prior criminal record is not determinative. (*People v. Martinez* (1999) 76 Cal.App.4th 489, 497.) In short, in considering the nature of the offenses and the offender, we conclude the punishment imposed upon Barba is not disproportionate to his culpability.

Barba argues the length of his sentence exceeds that imposed for more violent and serious crimes in California. He cites a number of California statutes, but the one bearing the most severe punishment is section 193, which imposes 11 years for manslaughter. Barba's analysis overlooks the fact that ordinarily, the permissible sentence range under section 288, subdivision (a) is three, six, or eight years in prison, less than that for manslaughter. His augmented sentence of 30 years to life was due to his conviction for crimes against two separate victims. Further, his sentence was increased under section 667.61, subdivisions (b), (c) and (e) because of the true findings he had committed the crimes on more than one victim. Consequently, section 193 for manslaughter is not comparable. (*People v. Crooks* (1997) 55 Cal.App.4th 797, 807.)

DISPOSITION

The judgment is affirmed.


                                                                    O'ROURKE, J.

I CONCUR:


McCONNELL, P. J.


I CONCUR IN THE RESULT:


HALLER, J.